Bowman v. Sparrow, 2016 NCBC 104.

STATE OF NORTH CAROLINA

COUNTY OF BEAUFORT

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 822

MILDRED G. BOWMAN; ALBERT AND
BERTHA BAKER; RONNIE CLARK;
JULIAN P. GOFF; O.C. JONES, JR.;
SONYA Y. JONES; and W. AXON SMITH;
on Behalf of Themselves and all Other
Similarly Situated Members of Pantego
Creek, LLC,

                Plaintiffs,

          v.

DEBORAH SPARROW; BRANTLEY
TILLMAN; LYNN ROSS; and DARREN
ARMSTRONG,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTION
FOR PRELIMINARY INJUNCTION**

THIS MATTER comes before the Court on Plaintiffs' Motion for Preliminary Injunction ("Motion"). In support of and in opposition to the Motion, Plaintiffs and Defendants filed numerous affidavits and other evidentiary materials. On December 21, 2016, the Court held a hearing on the Motion.

THE COURT, having considered the Motion, briefs in support of and in opposition to the Motion, arguments of counsel, the record evidence filed by the parties, and other appropriate matters of record, FINDS and CONCLUDES, in its discretion, that the Motion should be DENIED for the reasons below.

A. *Factual and Procedural Background.*[1]

1.      This matter involves the building that formerly housed the hospital facility in Belhaven, North Carolina and the land on which it sits ("Hospital")[2]. Pungo District Hospital Corporation ("PDHC"), a non-profit corporation owned by local citizens of Belhaven and surrounding areas, operated the Hospital from 1947 until 2011. In September, 2011, PDHC transferred control and authority over the Hospital to Vidant Health, Inc. ("Vidant"). In conjunction with the transfer of the Hospital, Pantego Creek, LLC ("Pantego Creek") was formed and the former shareholders in PDHC became members in Pantego Creek. Currently, there are approximately 92 members of Pantego Creek. Plaintiffs are members of Pantego Creek.

2.      At all times relevant to this action, Defendants were the Managers of Pantego Creek. Pantego Creek's written Operating Agreement ("Operating Agreement") gives the Managers extremely broad authority to manage the corporation. The Operating Agreement contains the following provisions:

> 3.1 Management. The business and affairs of the Company shall be managed by the Managers. In addition to the powers and authorities expressly conferred by this Agreement upon the Managers, the Managers shall have full and complete authority, power and discretion to manage and control the business of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary to or incident to the management of the Company's business, except only as to those acts and things as to which approval by the Members is expressly required by the Articles of

---

[1] Additional factual background surrounding the disputes involved in this case can be found in the Court of Appeals recent opinion in *Town of Belhaven, NC v. Pantego Creek, LLC*, No. COA16-373, 2016 N.C. App. LEXIS 1164 (November 15, 2016).

[2] Where necessary, this Order will refer separately to the "Hospital building" and the "land."

Organization, this Agreement, the Act or other applicable law.

4.3 A. Majority of the Managers shall be necessary to constitute a quorum for the transaction of business. Every act of decision done or made by a majority of the Managers present at a meeting duly held at which a quorum is present shall be regarded as the act of the Company, unless a greater number is required by law or by the Articles of Organization.

3. In September of 2013, Vidant announced its intent to cease operation of the Hospital in early 2014 because of significant operational losses and additional capital investments that were required due to the building's age and condition. Vidant also announced its intention to build a new 12,000 square foot multi-specialty medical facility to provide medical services to the Belhaven area.

4. In response to the announcement, Defendants commissioned a hospital management company to perform a professional assessment of the cost to continue operating the Hospital. The professional assessment was completed in January, 2014, and concluded that continuing to operate the Hospital would require: (a) a cash infusion of $3,000,000.00 during the current year as working capital; (b) a $9,250,000.00 loan to fund improvements to the Hospital; and, (c) Vidant to voluntarily transfer all assets of the Hospital, including equipment, cash, and accounts receivable, to Pantego Creek free of charge. Defendants determined that Pantego Creek did not have the funds to operate the Hospital and would not be able to secure a loan in such a large amount. In addition, Vidant was not willing to transfer the necessary assets to Pantego Creek free of charge. Nevertheless, Vidant offered to transfer the Hospital to Pantego Creek at no charge.

5. On February 25, 2014,[3] Defendants held a meeting with the members of Pantego Creek at which the members voted overwhelmingly not to operate the Hospital and to accept Vidant's offer to transfer the Hospital to Pantego Creek at no charge.

6. On March 17, 2014, Vidant transferred the Hospital to Pantego Creek. As part of the transfer, Vidant agreed to pay for the cost of demolition of the Hospital building if Pantego Creek wished to do so in the future.

7. Vidant ceased operation of the Hospital in June, 2014. Vidant opened a new 24-hour care medical facility in the Belhaven area in the summer of 2015.

8. In July, 2015, the Mayor of Belhaven obtained from the United States Department of Agriculture a conditional commitment to provide a loan in the amount of $5,970,000.00 to Belhaven to reopen and operate the Hospital. The fact that the town had obtained the conditional commitment for a loan was published in the local news and became widely known in the Belhaven community. Defendants determined, however, that Belhaven would not be able to meet the conditions for the loan, and that the loan amount would not be sufficient to reopen and operate the Hospital.

9. In an effort to find a productive use for the Hospital, Defendants commissioned a professional appraisal of the facility. The appraisal was completed in January, 2016, and contained the following assessment:

> The building is in extremely poor condition due to both flooding, mold/mildew and general aging process. It does not appear to this appraiser as if the building can be

---

[3] The parties differ on whether the meeting was held on February 24 or February 25, 2014, but the difference is not relevant to the issues raised by the Motion.

improved to required standards for future use. The building is a liability as is and should be demolished to allow for a different future use. The building "as is" is not considered in the appraisal of the land. However, the demolition costs are deducted from the value of the land to produce a final value.

10. The appraised value of the land on which the Hospital sits was $1,115,000.00, but the value of the land was diminished by an estimated $450,000.00 cost to demolish the Hospital for a net appraised value of $665,000.00.

11. On July 25, 2016, Defendants authorized an "Option to Purchase" with Strategic Healthcare of Florida, LLC ("Strategic Healthcare"), giving Strategic Healthcare until September 30, 2016, to purchase the Hospital for $1,000,000.00 in exchange for a $10,000.00 option fee. On July 28, 2016, the Defendants sent a letter to all members informing them of the Option to Purchase, and enclosing a form to vote for or against the Option to Purchase. The members approved the Option to Purchase with 74 members affirmatively voting to approve the Option to Purchase and no members voting against the Option to Purchase. Strategic Healthcare, however, did not exercise the Option to Purchase by the September 30, 2016, deadline.

12. On November 2, 2016, Defendants sent a letter to the members of Pantego Creek informing them that Strategic Healthcare had not exercised the Option to Purchase and enclosing a form for the members to vote to either "approve" or "disapprove" of the demolition of the Hospital facility. Sixty-nine (69) members of Pantego Creek voted to "approve" the demolition, while only 9 members voted to "disapprove."

13. Since the vote approving demolition of the Hospital, a group of local citizens calling themselves "Pungo Medical Center" has made two separate offers to purchase the Hospital. On or about November 17, 2016, Pungo Medical Center offered to purchase the Hospital for $500,000.00. On or about December 9, 2016, Pungo Medical Center made an offer of $665,000.00. Both offers were accompanied by a refundable payment of $1,000.00 earnest money, and were contingent on Pungo Medical Center being able to secure funding for the purchases within 90 days. Defendants considered both offers but concluded that they were not sufficient to warrant sale of the Hospital on the terms proposed.

14. On December 1, 2016, Brandon Hayes, Beaufort County Lead Building Inspector, inspected the Hospital. Hayes concluded that the Hospital building was in such a state of deterioration that it was dangerous and a hazard to the community. Hayes also concluded that the Hospital building should be condemned. He has not yet condemned the building because of the TRO currently in place.

15. On November 28, 2016, Plaintiffs filed their Complaint and Motion for Temporary Restraining Order in the Superior Court of Beaufort County. The Complaint raised a single cause of action for breach of fiduciary duty, which Plaintiffs purport to raise derivatively on behalf of Pantego Creek pursuant to N.C. Gen. Stat. § 55D-8-01 (hereinafter, references to the North Carolina General Statutes will be to "G.S."), against Defendants. The Complaint sought only injunctive relief, specifically including: (a) "a temporary restraining order requiring Defendants to cease and desist all demolition activities and removal of equipment and to cease engaging in any

action that will cause deterioration of the condition of the Hospital"; (b) an order "allowing Plaintiffs and all similarly situated members to rescind their vote in favor of the demolition"; and, (c) an order "[a]ppoint[ing] a special officer of the Court to conduct a membership meeting."

16. On November 28, 2016, the Honorable Cy Grant issued an ex-parte Temporary Restraining Order ("TRO"). The TRO provided that "Defendants, their agents and employees, are hereby enjoined and restrained from all demolition activities and are further enjoined from any other actions which would cause the condition of the Hospital buildings to further deteriorate." The TRO required Defendants to post security in the amount of $500.00, and set a hearing on the motion for preliminary injunction for December 8, 2016.

17. On November 30, 2016, Defendants filed a Notice of Designation of this action to the North Carolina Business Court. On December 1, 2016, the Chief Justice of the North Carolina Supreme Court issued an Order designating this case as a mandatory complex business case pursuant to G.S. §7A-45.4(b), and the case was assigned to the undersigned Special Superior Court Judge for Complex Business Cases.

18. On December 1, 2016, Defendants filed a Motion to Dismiss and Motion for Expenses.

19. On December 2, 2016, Plaintiffs filed their Amended Complaint. The Amended Complaint raised the same claim for breach of fiduciary duty against Defendants as was contained in the Complaint, and sought the same injunctive relief.

20.     On December 6, 2016, this Court issued an Order extending the TRO "until such time as the Court issues an order on the motion for preliminary injunction" upon the consent of the parties, and setting a hearing on the motion for preliminary injunction for December 21, 2016.

21.     On December 13, 2016, Defendants filed a Motion to Dismiss the Amended Complaint and Motion for Expenses.  On December 13, 2016, Defendants also filed with the Court sworn affidavits from 57 members of Pantego Creek, and on December 15, 2016, filed the affidavit of an additional member.[4] The 58 affidavits are identical or nearly identical in substance. Each of the affiants states that they reviewed the allegations in the Complaint and were aware that Plaintiffs were alleging the Defendants had "withheld or misrepresented information pertaining to the [Hospital], the closure of [the Hospital], and efforts to reopen [the Hospital]." (Affs. of Pantego Creek Members ¶ 4.)  Each of the affiants further states as follows:

> Contrary to the allegations of the Complaint, I believe that the managers of Pantego Creek have kept me fully and honestly informed of all events, facts and circumstances regarding Pantego Creek's affairs, including but not limited to the decision to close the [ ] Hospital and ownership of the [Hospital]. (*Id.* ¶ 6.)
>
> At the membership meeting held on February 25, 2014, I voted to approve Vidant's proposal because I believed it to be in the best interests of Pantego Creek and the community. Likewise, I voted in favor of the demolition of the [Hospital] because I believed it to be in the best interests of Pantego Creek and the community. (*Id.* ¶ 8.)
>
> The Complaint contains no facts or allegations which, even taken as true, would have caused me to vote differently in

---

[4] By contrast, Plaintiffs have filed affidavits from only 9 of the approximately 92 current members of Pantego Creek in support of their factual assertions.

> the past regarding any matter related to Pantego Creek, nor does the Complaint contain any facts or allegations that lead me to believe any actions of Pantego Creek or the managers of Pantego Creek to date have not been in the best interests of Pantego Creek or its members. (*Id.* ¶ 9.)

22. Defendants also have entered into contracts and incurred expenses for demolition of the Hospital building that they seek to recoup. These expenses include $925.00 per day for rental equipment and $12.00 per day for fence rental that will continue until demolition and clean-up are completed. Accordingly, for every day demolition activities are delayed, Pantego Creek incurs $937.00 in expenses, and from November 28, 2016, through December 21, 2016, this amount totals $22,488.00. Additionally, Defendants are now faced with a significant *ad valorem* tax expense due to their inability to demolish and clean-up the Hospital building prior to the end of 2016. The 2016 tax value of the Hospital building was $2,743,481.00 which represented 77.2% of the total tax value of Pantego Creek's assets. As such, the Hospital building represented $29,699.69 of Pantego Creek's *ad valorem* tax expense for 2016. Unable to demolish and clean up the Hospital building before current year end, Pantego Creek will likely be faced with a similarly-sized *ad valorem* tax for 2017 due to the delay.

### B. Analysis.

23. A preliminary injunction may be issued during litigation when "it appears by affidavit that a party thereto is doing or threatens or is about to do . . . some act . . . in violation of the rights of another party to the litigation respecting the subject of the action, and tending to render judgment ineffectual." G.S. § 1-485(2). A

preliminary injunction is an extraordinary measure that "will not be lightly granted." *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E.2d 478, 483 (1976) (citation omitted). The movant bears the burden of establishing the right to a preliminary injunction. *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975).

24.    To obtain a preliminary injunction a movant must show "a likelihood of success on the merits of his case and . . . [that the movant] is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of his rights during the course of litigation." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466, 579 S.E.2d 449, 452 (2003) (citations omitted); *accord Looney v. Wilson*, 97 N.C. App. 304, 307-08, 388 S.E.2d 142, 144-45 (1990). Likelihood of success means a "reasonable likelihood." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 404, 302 S.E.2d. 754, 761 (1983).

25.    In addition, the Court must balance the equities, and a preliminary injunction "should not be granted where there is a serious question as to the right of the defendant to engage in the activity and to forbid the defendant to do so, pending the final determination of the matter, would cause the defendant greater damage than the plaintiff would sustain from the continuance of the activity while the litigation is pending." *Board of Provincial Elders, etc. v. Jones*, 273 N.C. 174, 182, 159 S.E.2d 545, 551-552 (1968); *see also County of Johnston v. City of Wilson*, 136 N.C. App 775, 780, 525 S.E.2d 826, 829 (2000) (The Court should weigh "the advantages

and disadvantages to the parties" in deciding whether to issue a preliminary injunction). The issuance of an injunction is "a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *State v. Fayetteville St. Christian School*, 299 N.C. 351, 357, 261 S.E.2d 908, 913 (1980). The Court may examine evidence from both parties in determining whether to grant a preliminary injunction. *See Wrightsville Winds Townhouses Homeowners' Ass'n v. Miller*, 100 N.C. App. 531, 535, 397 S.E.2d 345, 346 (1990) ("[A] decision by the trial court to issue or deny an injunction will be upheld if there is ample competent evidence to support the decision, even though the evidence may be conflicting and the appellate court could substitute its own findings.").

26. The Court must first decide if Plaintiffs have established that they are likely to succeed on the merits of their claim for breach of fiduciary duty. Defendants, as the managers of Pantego Creek, owed a fiduciary duty to Pantego Creek. Pursuant to the North Carolina Limited Liability Act, a manager or officer of a limited liability company "shall discharge that person's duties (i) in good faith, (ii) with the care an ordinary prudent person in a like position would exercise under similar circumstances, and (iii) subject to the operating agreement, in a manner the manager believes to be in the best interests of the LLC." G.S. §§ 57D-3-21(a); 57D-3-23; *see Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474, 675 S.E.2d 133, 137 (2009) (manager owed a fiduciary duty to the limited liability company).

27. Section 57D-3-21(b) further provides that

> In discharging such duties, a manager is entitled to rely on
> information, opinions, reports, or statements, including

financial statements or other financial data, if prepared or presented by any person or group of persons the manager believes to be reliable and competent in such matters and the manager does not have actual knowledge concerning the matter in question that makes such reliance unwarranted.

28. On the record before this Court, Plaintiffs have wholly failed to establish any reasonable likelihood of success on the merits. To the contrary, the evidence before the Court at this stage of the proceedings shows that Defendants acted carefully and conscientiously in discharge of their duties as the managers of Pantego Creek at all times following Vidant's announcement that it was closing the Hospital. At every turn, Defendants considered the relevant facts and circumstances surrounding the economic viability of the Hospital and the options available to Pantego Creek. Defendants commissioned reports from appropriate subject-matter experts and then relied upon the information obtained from those sources to make informed decisions about the appropriate courses of action and recommendations to be made to the members of Pantego Creek.

29. In addition, the vast majority of the members of Pantego Creek have submitted sworn affidavit testimony that they were kept "fully and honestly informed of all events, facts and circumstances" surrounding the decisions regarding the Hospital. Plaintiffs have offered no significant evidence that Defendants breached their obligations to Pantego Creek.

30. Plaintiffs rely primarily on their claim, supported by the affidavits of a handful of Pantego Creek members, that at the February 25, 2014, meeting, Defendants "materially misrepresented to the members that if they voted in favor of

acquiring the Hospital, they would each be personally liable for $28,000.00 and they would be personally liable if it failed." (Pls.' Br. Supp. Mot. Prelim. Inj. 12.) Plaintiffs argue that the terms of Pantego Creek's Operating Agreement make clear that the individual members cannot be required to make additional capital contributions and cannot be held personally liable for the LLC's debts.[5] (*Id.* at 13.) Plaintiffs contend that "[r]elying on these material misrepresentations, a majority of the members voted against acquiring and operating the Hospital." (*Id.*)

31. The weight of Defendants' evidence, however, simply overwhelms Plaintiffs' claims. Not only have the majority of Pantego Creek's members stated that they believe Defendants "fully and honestly informed" them regarding the transaction, they have clearly stated that they do not consider the alleged misrepresentation "material" to their decisions to vote against acquiring and operating the Hospital, and it would not have changed their votes. In the face of Defendants' evidence, Plaintiffs simply have not established a likelihood of being able to prove that Defendants made material misrepresentations in breach of their fiduciary duties.[6] The Motion should be DENIED.

---

[5] At the hearing, the Court asked Plaintiffs' counsel why Plaintiffs could not have reviewed the Operating Agreement and determined for themselves that they were not required to make capital contributions and were not personally liable for Pantego Creek's debts. In response, Plaintiffs' counsel simply argued that Plaintiffs are "not lawyers" and should not be held responsible for reviewing the Operating Agreement.

[6] In addition, each of the four Defendants has provided affidavit testimony denying that such misrepresentation was made, and offering the following highly plausible explanation of actual events: "At the February 24, 2014 (*sic*) meeting, neither the Managers nor counsel for Pantego Creek told the Members that, if they voted to continue services at the Former Hospital Building, they would be personally obligated to pay $28,000.00. Instead, the $3,000,000.00 cash requirement from the RCHA assessment was discussed; a Member in the audience asked whether they would have personal liability for operations at the Former

32.     Finally, a balancing of equities leads the Court to the same conclusion. The Hospital has been closed for two and one-half years. During that time, no viable means of reopening and operating the Hospital has been found, despite efforts by Pantego Creek, LLC, the Town of Belhaven, and concerned area citizens. The Hospital building is now in a dire state of disrepair and has become a potential hazard to the community. The balance of the equities, at this time, leans in favor of permitting Defendants to carry out the duly approved will of the members of Pantego Creek that the building be demolished so that Pantego Creek can move forward with determining how it can best provide value to the community through alternative uses of the property.

THEREFORE, IT IS ORDERED that Plaintiff's Motion for Preliminary Injunction is DENIED.

SO ORDERED, this the 28th day of December, 2016.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases

---

Hospital Building; the attorney for Pantego Creek referred that Member to the limited liability company structure of Pantego Creek, but indicated that RCHA's assessment called for $3,000,000 in cash and that the money had to come from somewhere; and another Member in the audience commented that the $3,000,000 cash requirement equated to $28,000 per member." (*See e.g.*, Tillman Aff. ¶ 18.)